IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KRISS DOBREV,

      Plaintiff,

 v.

WALWORTH COUNTY DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
THELMA KUNTZ, DAVID THOMPSON, and
ETTY WILBERDING,

      Defendants.[1]

OPINION & ORDER

16-cv-1-jdp

---

   This lawsuit arises out of the difficulties faced when trying to care for a child with severe behavioral issues. The child, whom I'll refer to as D.D., is an 18-year-old boy who has been diagnosed with autism, mental retardation, and several other mental disorders. The plaintiff is D.D.'s father, Kriss Dobrev. The defendants are the Walworth County Department of Health and Human Services (DHHS) and three of its employees, Thelma Kuntz (a case manager), David Thompson (the deputy director of the DHHS), and Etty Wilberding (a DHHS manager), each of whom has participated in providing services to D.D. and his family.

   The relationship between Dobrev and the DHHS deteriorated when the DHHS was unable or unwilling to provide D.D. with certain services that Dobrev believed were needed. In the end, D.D. was placed in foster care, the DHHS attempted to terminate the Dobrevs' parental rights, and Kriss Dobrev filed this lawsuit, asserting claims under the Fourteenth

---

[1] I have updated the caption to reflect the correct spelling of defendants' names.

Amendment, the Individuals with Disabilities Education Act (IDEA), and Wisconsin state law against defendants.

It's clear that Dobrev's basic complaint is with the DHHS's refusal to provide D.D. with the services that Dobrev requested. But the role of this court is not to second-guess a county agency's discretionary decisions about how best to provide assistance to a disabled child. My review is limited to the legal causes of action before me. On the legal merits of those causes of action, I must grant defendants' motion for summary judgment. Dkt. 60.

## UNDISPUTED FACTS

I begin with an observation: neither side has been particularly helpful to the court in identifying the core of undisputed facts. Dobrev points to evidence in support of some of his proposed facts, but many of his proposed facts are conclusory and lack evidentiary support. Some of defendants' proposed facts suffer the same problems. And many of defendants' proposed facts contain multiple factual propositions in each paragraph, contrary to the court's procedures on motions for summary judgment. *See* Dkt. 8, at 12. I will accept a proposed fact as true where neither side disputes it, and where the proponent cites to admissible evidence in support of the fact, and the other side offers no evidence in response. Because Dobrev is a pro se litigant, I will also accept his proposed facts as true where they relate to matters of which he has personal knowledge and do not constitute inadmissible hearsay, that is, to the extent that they would be admissible if they were stated in a declaration or affidavit.

The following facts are undisputed except where noted.

In 2000, Florida residents Kriss and Christina Dobrev had a son, D.D. When D.D. was three or four, he was diagnosed with severe autism. In Florida, the Dobrevs obtained effective—

but expensive—private treatment for D.D.'s autism, including Applied Behavioral Analysis (ABA) therapy.

In 2006, the Dobrevs moved to Walworth County, Wisconsin, where they hoped to receive free therapy for D.D. They enrolled D.D. at Lakeland School and placed his name on the Wisconsin autism treatment services wait list. They also reached out to the DHHS for assistance. The DHHS provided some services to the Dobrevs while they were waiting for state funding. Dobrev says the services were inadequate. In September 2008, D.D.'s name moved to the top of the wait list and he began receiving state-funded intensive autism services, including ABA therapy, through the Wisconsin Early Autism Project (WEAP).

The intensive services were supposed to continue until September 2011. But in July 2011, WEAP discontinued its services early because D.D.'s "dangerous, aggressive, and noncompliant behaviors ha[d] become increasingly difficult for his family and his treatment team to manage." Dkt. 81-31, at 1. At this point, D.D. was 10 years old, weighed more than 100 pounds, was functionally nonverbal, and had required police intervention and hospitalization several times due to his violent behavior. WEAP's lead therapist recommended that D.D. "be placed into a higher level of care," including "24-hour supervision by trained personnel." *Id.* at 2. She noted that D.D.'s psychiatrist recommended hospitalization for 4 to 12 weeks to optimize D.D.'s medication regime, which included several psychotropic medications and laxatives. She explained that if that didn't work, D.D. might "require long-term residential care." *Id.*

At this point, the state transferred management of D.D.'s case back to the DHHS. The Dobrevs asked the DHHS to fund D.D.'s placement at one of two residential schools for children with autism and other behavioral disorders; the DHHS refused, on the basis that

funding for such placement was the school district's responsibility. The Dobrevs also asked the DHHS to fund D.D.'s short-term hospitalization as recommended by the psychiatrist. Before the DHHS determined whether it would do so, the Dobrevs hired a lawyer and filed a voluntary Child In Need of Protection and/or Services (CHIPS) petition in the Walworth County Circuit Court. The petition alleged that D.D. was "in need of special care and treatment" that the Dobrevs were "unable to provide for him in the home." Dkt. 68-1, at 3. It appears that the Dobrevs may have filed the petition in hopes of getting the DHHS to fund D.D.'s short-term hospitalization.

In October 2011, the circuit court granted the petition and placed D.D. under court jurisdiction for one year. The next month, D.D. was hospitalized. He remained in the hospital for 90 days, until January 2012. The parties disagreed about where D.D. should go upon discharge: the DHHS believed D.D. should return home; the Dobrevs believed he should be placed in residential care. (The Dobrevs point to a January 6, 2012 letter from a WEAP psychologist, who reviewed D.D.'s hospitalization records and recommended that he "be placed in a long-term residential treatment facility." Dkt. 81-29, at 2. The psychologist expressed "concern" that D.D.'s "behavioral stability would quickly deteriorate" if he were to return home. *Id.*) The DHHS proposed a compromise: when D.D. was discharged from the hospital, he would go to a foster home and remain there for 30 days as a "respite stay." Dkt. 81-7. A DHHS employee warned the Dobrevs that if they did not accept this compromise or accept D.D. back into their home, the DHHS would pursue an involuntary placement of D.D. in foster care, which might result in "an investigation of child neglect" and "action involving" the Dobrevs' younger son, J.D. *Id.* The Dobrevs then signed the paperwork necessary to authorize the respite stay.

4

At the end of January, D.D. was discharged to the foster home. Soon after, each side filed separate requests to change placement with the Walworth County Circuit Court. The DHHS asked the court to approve continued placement of D.D. in foster care; the Dobrevs asked the court to order D.D. placed in a long-term residential treatment facility. *See* Dkt. 68-7. The details of the circuit court's rulings are unclear, but the end result was that the Dobrevs' request was denied, and D.D. remained in foster care through the end of April, when the circuit court ordered that he return to the Dobrevs' home, where the Dobrevs would receive up to 28 hours per week of in-home support and several "respite" days per month through the DHHS. Dkt. 68-9, at 2. The circuit court warned the Dobrevs that if they refused to follow the DHHS's treatment plan (for example, by refusing to administer D.D.'s medication as prescribed) or put D.D. in danger "by the lack of cooperation, they could face neglect charges and possible termination of their parental rights."[2] *Id.*

Throughout the summer of 2012, D.D. lived at home with the Dobrevs. But the Dobrevs did not receive the full amount of in-home support that the circuit court had approved. The parties dispute who was to blame for the lack of services.

Around the same time, several incidents caused the DHHS to question whether the Dobrevs were following its treatment plan. On two occasions when defendant Kuntz stopped by the Dobrevs' home to observe D.D. as part of her duties as a DHHS case manager, she discovered that neither Kriss nor Christina was home. Instead, D.D. was alone with an in-home

---

[2] The administration of medication appears to be a source of contention between the Dobrevs and the DHHS, especially the administration of D.D.'s laxatives. D.D. suffers from severe constipation; a doctor prescribed laxatives to address this issue. The DHHS and D.D.'s foster parents believed that the laxatives helped. The Dobrevs, on the other hand, appear to disagree with the necessity of laxatives, instead wishing to treat D.D.'s constipation through changes in his diet.

5

support worker, contrary to the DHHS's expectation that a parent be present with the in-home support worker at all times. (Kriss Dobrev was often gone from the home due to his job as an over-the-road trucker, leaving Christina Dobrev as the sole caregiver for D.D. and his younger brother, who also has autism.) On several other occasions, Child Protective Services investigated suspected neglect following Christina Dobrev's reports of D.D.'s dangerous and aggressive behavior and her apparent inability to control D.D. *See* Dkt. 68-11; Dkt. 68-12; Dkt. 81-65. For example, on one occasion, Christina reported that D.D. broke his younger brother's nose and then banged his own head on a concrete floor so hard that he almost became unconscious, and that Christina believed D.D. needed to go to the emergency room but did not take him because she was unable to lift him. The DHHS also believed that the Dobrevs weren't administering D.D.'s medication as prescribed. (Dobrev admits that they weren't giving D.D. his prescribed laxatives, but he says that they were properly administering the rest of D.D.'s medications at this point.)

As a result, the DHHS filed a request for temporary physical custody in the Walworth County Circuit Court, alleging that there were concerns about D.D.'s safety at home. The DHHS also filed a neglect petition in a new, separate CHIPS action against the Dobrevs. The neglect petition recounted the history of D.D.'s treatment and care, with a focus on the investigations of suspected neglect. Dobrev now claims that the neglect petition was "misleading" and "not true." Dkt. 86, ¶ 67. (He doesn't explain what parts of the petition, specifically, are untrue, but I gather that he believes that the petition inaccurately characterizes him and his wife as bad parents who are unwilling to care for D.D. and who request unnecessary help from the DHHS, while inaccurately characterizing the foster mother as a good parent who is able to care for D.D. without in-home support.) The parties agree that the Dobrevs didn't

6

challenge the veracity of the petition at the time of its filing. Eventually, the DHHS voluntarily withdrew the neglect petition with the understanding that the original CHIPS action would adequately address the pending issues.

On September 26, 2012, in the original CHIPS action, the circuit court found that the Dobrevs were unable to adequately supervise and care for D.D., and it approved D.D.'s temporary return to the foster home. On October 17, and again on November 26, the circuit court approved D.D.'s continued placement in foster care and ordered that all visits between the Dobrevs and D.D., even while D.D. was at school, be approved by the DHHS. The court outlined nine conditions that the Dobrevs would have to meet before D.D. would be returned to them permanently. The conditions included demonstrating the ability to maintain a safe, suitable, and stable home; responding to Kuntz's emails and phone calls in a timely manner; providing Kriss Dobrev's work schedule to Kuntz; and administering D.D.'s medications as prescribed.

The Dobrevs visited with D.D. once or twice a month for the next few months. Defendants blame the low number of visits in the Dobrevs' inflexibility and failure to request additional visits; Dobrev blames Kuntz for failing to set up visits that worked with his family's schedule. Emails between Christina Dobrev and Kuntz show that Kuntz asked Christina to propose visitation dates, and Christina declined; Kuntz also proposed setting up regular biweekly visits, and Christina declined, explaining that she wasn't sure if she'd be "able to handle" D.D. and wanted to see how one visit went before scheduling more. Dkt. 81-19, at 18.

The DHHS received concerning reports about several of the visits that did occur during this time period. In November, the Dobrevs returned D.D. to the foster home early because he attempted to run away; in December, the Dobrevs failed to give D.D. his prescribed laxatives

7

and Christina reported that she "can't handle" D.D. Dkt. 81-19, at 37. In January 2013, the Dobrevs again failed to give D.D. his prescribed laxatives and other medication and did not send the laxatives back to D.D.'s foster parents. Because of these reports, the DHHS asked the circuit court to award it joint custody of D.D. The circuit court did so on February 6.

The Dobrevs continued to visit with D.D. occasionally after the DHHS was awarded joint custody. At the end of February, D.D. visited the Dobrevs at home for a full week, the longest visit they'd had since D.D. was placed in foster care the previous September. When D.D. returned to his foster family, the foster mother informed the DHHS that it appeared the Dobrevs had not given him his prescribed medication, causing increased behavioral problems and multiple trips to the emergency room for severe constipation. In March, the DHHS learned that Christina Dobrev wrote a note to D.D.'s teachers indicating that she was not giving D.D. his medications as prescribed. *See* Dkt. 68-18 ("If [D.D.] takes his pills the way Walworth County suggests, he will always be going to the bathroom and have behaviors. I will never ever follow the list his foster parents do. . . . There was increase in his pills that I didn't know about. I am following what [D.D.] was taking before."). Around the same time, D.D.'s psychiatrist called the DHHS to express concern that the Dobrevs were not giving D.D. his medications as prescribed. As a result, the DHHS decided to allow only supervised, non-overnight visits between the Dobrevs and D.D.

In April and early May, 2013, the DHHS set up five supervised visits with D.D. Christina Dobrev attended all of the visits; Kriss Dobrev was present for two of them. The DHHS became concerned about Christina Dobrev's mental state and D.D.'s safety during supervised visits. The details are unclear, but Dobrev agrees that Christina suffers from mental health problems, specifically post-traumatic stress disorder. So the DHHS decided to allow

8

supervised visits only when Kriss Dobrev could be present. After several of these visits occurred, the DHHS decided to allow unsupervised visits as long as Kriss Dobrev was present. The Dobrevs had unsupervised visits a couple times a month from May through October. It appears that the Dobrevs tried to schedule additional visits at the last minute, but those visits didn't occur because of the foster family and D.D.'s schedule. At some of these visits, Christina Dobrev refused to give D.D. his medication. The DHHS then decided to revert to only supervised visits because of the refusal to give D.D.'s medications and concerns for D.D.'s safety. The DHHS asked Lutheran Social Services to arrange supervised visits; from November 2013 to October 2014, Cristina Dobrev visited with D.D. approximately once every week. Kriss Dobrev was present for many, but not all, of these visits. At some of these visits, Christina continued to refuse to give D.D. his medication.

The DHHS also invited the Dobrevs to attend D.D.'s doctor appointments during this time. Christina rarely attended. Dobrev blames this on the DHHS's failure to schedule the appointments at a time that worked for Christina. But defendants say that they would have rescheduled appointments if the Dobrevs had requested that they do so.

Meanwhile, the Dobrevs still hadn't met the conditions required to return D.D. to them permanently. The core dispute remained: the DHHS believed that D.D. should be returned home to the Dobrevs as soon as the Dobrevs were willing; but the Dobrevs wanted D.D. placed in a long-term residential treatment facility or returned home only if the DHHS provided "24/7" in-home support for him. Dkt. 86, ¶ 94. Additionally, D.D.'s foster parents had expressed a willingness to adopt him.

In March 2014, Walworth County, through its corporation counsel, filed a petition for termination of the Dobrevs' parental rights. In the petition, corporation counsel explained that

D.D. had been placed in a foster home since the fall of 2012 and that the Dobrevs still hadn't met the conditions of return ordered by the circuit court in November 2012. Specifically, corporation counsel explained that the Dobrevs still wanted D.D. to be placed at a residential treatment facility; that they had "unrealistic expectation[s]" of D.D.'s abilities; that Christina Dobrev was "mentally unstable," indicated that she could not handle D.D. alone, continued to give D.D. his medications improperly, and failed to communicate with DHHS workers; and that Kriss Dobrev still hadn't given his work schedule to Kuntz. Dkt. 68-22. Corporation counsel stated that "there is a substantial likelihood that the parents will not meet conditions of return within the next 9 months." *Id.* at 8. Over the summer, the individual defendants met with corporation counsel and other officials to discuss how to move forward with the termination of parental rights petition and the adoption of D.D.

In September 2014, corporation counsel dismissed the termination of parental rights petition because the foster parents decided that they were unwilling to adopt D.D., although they remained willing to provide long-term care for him. The circuit court ordered that D.D. remain placed in foster care and that the conditions of return in the CHIPS petition remain active.

In October 2014, the DHHS asked Jim Para-Cremer, a behaviorist who had been working with D.D. for many years, to observe D.D.'s visits with the Dobrevs because the DHHS had received reports of D.D. behaving particularly poorly at recent visits. Christina Dobrev refused; the DHHS decided not to schedule any further visits until Para-Cremer was allowed to attend. Thus, the Dobrevs did not visit with D.D. at all in November. The visits resumed in December 2014 and January 2015, after the DHHS agreed to have Kuntz and another official observe the visits and collect data in Para-Cremer's stead.

But then, in January 2015, the Dobrevs attended a meeting at D.D.'s school with Kuntz, among others. The details are unclear, but everyone agrees that the Dobrevs were upset with Kuntz, that they argued that D.D. was over-medicated, and that they behaved in such a way that school officials "expressed concerns" for Kuntz's safety. Dkt. 86, ¶ 119. As a result, Kuntz informed the Dobrevs that they would not be allowed to visit D.D. until they attended one of D.D.'s appointments with his psychiatrist so that they could understand D.D.'s prescriptions. (By that point, the Dobrevs hadn't attended a medical appointment with D.D. in more than a year.)

On April 1, 2015, Kuntz asked the circuit court to approve suspension of all visits between D.D. and the Dobrevs until the Dobrevs completed a psychological evaluation, signed "all releases of information and any consents for treatment as requested," attended D.D.'s psychiatric appointments, provided "verification of employment and a work schedule," and demonstrated "an understanding of the importance of following doctor's orders/treatment plan in all environments." Dkt. 68-25, at 2. Kuntz listed numerous reasons for this request, including that the Dobrevs refused to meet the conditions of return, refused to work with Para-Cremer, and refused to sign forms that were necessary to secure funding for D.D.'s services; Christina refused to give D.D. his medication as prescribed; D.D. continued to behave particularly poorly when visiting his parents; and neither parent had attended one of D.D.'s psychiatric appointments in more than a year. After several continuances, the circuit court suspended visitation and provided that visits could resume once the Dobrevs signed the forms requested by the DHHS, completed psychological evaluations, and attended D.D.'s doctor appointments unless their absence was excused by the DHHS ahead of time. *See* Dkt. 68-27. The circuit court also provided that Kriss Dobrev could resume visiting D.D. only after

11

providing his work schedule to the DHHS. Although the Dobrevs attended some of D.D.'s medical appointments in 2015, there is no indication that they have otherwise complied with the circuit court's order.

ANALYSIS

This case is not about whether the DHHS could or should have done something more to care for D.D. Instead, it is about Dobrev's specific claims alleging violation of his constitutional rights and federal and state law. Defendants move for summary judgment on all of Dobrev's claims. To succeed on their motion, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). If Dobrev fails to establish the existence of an essential element on which he will bear the burden of proof at trial, summary judgment for defendants is proper. *See Celotex*, 477 U.S. at 322. All reasonable inferences from the facts in the summary judgment record must be drawn in Dobrev's favor as the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

A. IDEA claims

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, requires school districts to provide a free appropriate public education (FAPE) to each child with disabilities by developing an individualized education plan (IEP). It also establishes administrative procedures for resolving disputes between pupils and school representatives. *See*

§ 1415. When a plaintiff "seek[s] relief that is also available under" the IDEA, he must exhaust the IDEA's administrative procedures before bringing suit. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 752 (2017); *see* § 1415(*l*).

I allowed Dobrev to proceed on claims under the IDEA that he was denied an opportunity to participate meaningfully in crafting D.D.'s IEP, based on his allegations that defendants restricted his "access to school . . . and [wrote] policy to discriminate [against him] by refusing to let him and his wife see the program in the school." Dkt. 49, at 3.

Defendants contend that Dobrev's IDEA claims must be dismissed because he failed to exhaust his administrative remedies before bringing the claims. Dobrev concedes that he did not exhaust his administrative remedies under the IDEA. But he contends that he didn't have to. It's true that "exhaustion may be excused if administrative review would be futile or inadequate." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 494 (7th Cir. 2012). But Dobrev doesn't explain why administrative review of his IDEA claims would have been futile or inadequate; he argues that he "raises a substantial constitutional claim which could not be resolved through the IDEA administrative process" and that "nothing in the statute permits a hearing officer to decide whether the defendants' past conduct was unconstitutional." Dkt. 80, at 38, 39. He concludes by stating,

> The pending issue here is the actions alleging misconduct of defendants, so egregious as to violate rights independent of the IDEA, such as those provided by the Fourteenth Amendment's protection of parents and students' liberty interests.

*Id.* at 40. He does not argue the merits of his IDEA claims. So it appears that he never intended to assert substantive claims under the IDEA. Rather, he appears to argue that his failure to exhaust his administrative remedies under the IDEA shouldn't bar him from bringing his *other* claims, which do not seek relief that is also available under the IDEA, against defendants. I

agree. So I will grant judgment in defendants' favor on the IDEA claims and proceed to consider Dobrev's remaining claims.

**B. Familial-association claims**

As I explained in my January 24, 2017 order, the Fourteenth Amendment to the United States Constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Dkt. 40, at 5 (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). But that right "must be balanced against the state's interest in protecting children from harm." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017). Thus, a parent's right to familial association is not violated when a government official has "evidence supporting a reasonable suspicion of future harm to the" child. *Id.* at 235. "A reasonable suspicion requires more than a hunch but less than probable cause." *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011) (quoting *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010)).

Here, the DHHS took the first steps to place D.D. in foster care after the Dobrevs indicated that they were unable to care for D.D. in their home. And each time the DHHS took further steps to limit the Dobrevs' care, custody, and control of D.D., it did so after receiving evidence that the Dobrevs were unable to properly care for D.D.: the Dobrevs' self-reports of being unable to control D.D.'s violent outbursts, admitted refusal to administer prescribed medications to D.D., and continued requests that D.D. be sent to a residential treatment facility. This evidence amply supports a reasonable suspicion that D.D.'s safety was in danger. Whether D.D. got what was best for him at every turn, or whether Dobrev and his wife were always treated fairly might be debatable. But no reasonable juror could find that defendants ever acted without at least probable cause, and thus no reasonable juror could find that

defendants violated Dobrev's right to familial association. I will enter judgment in defendants' favor on these claims.

**C. Malicious-prosecution claims**

In my January 24 order, I explained that malicious-prosecution claims are rarely cognizable in federal courts "because individuals do not have a federal right to not be prosecuted without probable cause." Dkt. 40, at 6. But at the screening stage, I allowed Dobrev to proceed on malicious-prosecution claims concerning the petition for termination of parental rights. Two months later, the Court of Appeals for the Seventh Circuit clarified that a malicious-prosecution claim would be "litigable as a constitutional claim only if there were no adequate state tort remedy, [and] Wisconsin law provides such a remedy." *Cannon v. Newport*, 850 F.3d 303, 306, *cert. denied*, 138 S. Ct. 320 (2017). In light of this recent precedent, Dobrev cannot bring federal malicious-prosecution claims against defendants, and I will enter judgment in defendants' favor on these claims.

**D. State-law claims**

Dobrev's remaining claims arise under Wisconsin law: he accuses defendants of defamation, trespass, and negligent and intentional infliction of emotional distress. Because the facts underlying these claims are the same as the facts underlying Dobrev's constitutional claims, I may exercise supplemental jurisdiction over the state-law claims. 28 U.S.C. § 1367. I will do so here, despite that there are no remaining federal claims, because it is clear that Dobrev cannot succeed on the state-law claims, either.

As I previously explained, Wisconsin's notice-of-claim statute, Wis. Stat. § 893.80(1d), requires a plaintiff to notify a governmental agency about his state-law claims before he can

sue the agency under those state law-theories. *See* Dkt. 40, at 5, and Dkt. 49, at 2–3. Section 893.80(1d) states in part:

> [N]o action may be brought or maintained against any . . . governmental subdivision or agency thereof nor against any officer, official, agent or employee of the . . . subdivision or agency for acts done in their official capacity or in the course of their agency or employment upon a claim or cause of action unless:
>
> (a) Within 120 days after the happening of the event giving rise to the claim, written notice of the circumstances of the claim signed by the party, agent or attorney is served on the . . . governmental subdivision or agency and on the officer, official, agent or employee . . . Failure to give the requisite notice shall not bar action on the claim if the . . . subdivision or agency had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant . . . and
>
> (b) A claim containing the address of the claimant and an itemized statement of the relief sought is presented to the appropriate clerk or person who performs the duties of a clerk or secretary for the defendant . . . subdivision or agency and the claim is disallowed.

In other words, to bring state-law claims against defendants, before he filed this lawsuit, Dobrev must have (1) sent a written notice to each defendant, describing the events giving rise to the claims, within 120 days of the events; (2) sent a claim listing his address and the relief he seeks to the DHHS; and (3) waited until the claim was disallowed by the DHHS. The notice-of-claim statute operates as an affirmative defense. Dkt. 49, at 2–3. That is, once defendants raise the statute as a defense—as they have here—Dobrev must prove compliance with the statute. If he does not, his state-law claims must be dismissed.

Dobrev admits that he did not comply with the notice-of-claim statute. But he makes three arguments that he should be allowed to proceed anyway. First, he argues that Wisconsin's notice-of-claim statute doesn't apply to federal claims under 42 U.S.C. § 1983. That's true—

I'm granting summary judgment in defendants' favor on the federal claims for reasons unrelated to the notice-of-claim issue. The question here is whether Dobrev's *state* claims are barred by his failure to provide notice of his claims. Second, Dobrev argues that the DHHS had actual notice of the claim because he "told" defendants (or at least an attorney representing DHHS) that he "wants to file in federal court." Dkt. 86, ¶ 131. Dobrev does not explain when he said this or whether he said what events formed the basis of his intended claims, so he has not shown that his failure to provide the requisite notice has not been prejudicial to defendants. *See* § 893.80(1d)(a). Third, Dobrev cites the continuing violation doctrine. *See* Dkt. 80, at 4–5. He argues that "[e]ach time Plaintiff's right to privacy is violated, a new cause of action accrued, permitting him to file a new notice of injury under Wis. Stat. § 893.80(1d)." *Id.* at 5. This argument would only be relevant if Dobrev had sent a notice of claim to defendants more than 120 days after the initial incident giving rise to his claims. But here, Dobrev *never* sent a notice of claim to defendants. So his state-law claims are barred by Wisconsin's notice-of-claim statute.

Even if Dobrev had complied with the notice-of-claim statute, his state-law claims would not survive. His trespass claims, which are premised on Kuntz's two visits to Dobrev's home in the summer of 2012 when neither Kriss or Christina were present, are barred by the three-year statute of limitations applicable to intentional trespass claims. *See* Wis. Stat. § 893.57. His defamation claims fail because the communications that he identifies as defamatory— defendants' statements that he and his wife have not met the court-ordered conditions of return—are absolutely privileged, because they were made to individuals "involved in and closely connected to" the various state-court proceedings and were relevant to those proceedings. *Rady v. Lutz*, 150 Wis. 2d 643, 444 N.W.2d 58, 59–60 (Ct. App. 1989). His

17

intentional infliction of emotional distress claims fail because he points to no evidence that any defendant intended to cause him emotional distress. And his negligent infliction of emotional distress claims fail because he points to no evidence that any defendant failed to exercise ordinary care—that is, that they were negligent. *See Jackson v. McKay-Davis Funeral Home, Inc.*, 830 F. Supp. 2d 635, 654 (E.D. Wis. 2011).

Finally, even if I allowed Dobrev to proceed on malicious-prosecution claims under Wisconsin law, those claims would fail, too, because he points to no evidence that any defendant instituted the state-court proceedings with *malice* or that the proceedings were instituted without probable cause. *See Wis. Pub. Serv. Corp. v. Andrews*, 2009 WI App 30, ¶ 23, 316 Wis. 2d 734, 766 N.W.2d 232 (listing the elements of a malicious-prosecution claim under Wisconsin law).

I will grant defendants' motion for summary judgment on all of Dobrev's state-law claims as well as on his federal claims.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 60, is GRANTED.
2. The clerk of court is directed to close this case.

Entered June 25, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge